IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RAYMOND LLOYD,                              *

    *Plaintiff*,                              *

v.                                          *       **Civil Case No. 1:23-cv-01987-JMC**

BALTIMORE POLICE DEPARTMENT           *

    *Defendant*.                              *

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Raymond Lloyd ("Plaintiff") initiated the present suit against the Baltimore Police Department ("BPD" or "Defendant") on July 24, 2023.  (ECF No. 1). Plaintiff alleges (1) a violation of Family and Medical Leave Act of 1993 ("FMLA"), as codified, 29 U.S.C. § 2601 *et seq.* ("FMLA"); and () a violation of Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e *et seq*. ("Title VII") based on retaliation.  Presently pending before the Court is Defendant's Motion for Summary Judgment.  (ECF No. 69).  The Motion is fully briefed (ECF Nos. 69, 81, 82) and no hearing is necessary pursuant to Local Rule 105.6 (D. Md. 2025).  For the reasons that follow, Defendant's motion for summary judgment will be GRANTED.

I.      **BACKGROUND**

        *i.        Overview*

The instant litigation arises from Plaintiff's FMLA leave from BPD in August 2022. Plaintiff worked for BPD by way of the national union known as the Fraternal Order of Police (the "FOP").  (*Memorandum of Understanding*, ECF No. 69-14; *BPD Uniform and Equipment Policy*, ECF No. 69-45; *BPD Clothing Allowance Policy*, ECF No. 69-44). The convoluted record before the Court warrants a brief overview before delving into greater detail below.  During 2021, Plaintiff

worked in a contentious environment that resulted in multiple performance warnings, including a warning that if Plaintiff had one more perceived "incident," he would be "kicked out" of the Public Integrity Division of the BPD. Notwithstanding that admonition, it is undisputed that into June 2022, Plaintiff's superiors continued to note multiple perceived incidents in which Plaintiff did not perform the duties of his job to their satisfaction.

It is further undisputed that Plaintiff began suffering from severe PTSD symptoms at some point prior to June 2022. His PTSD descriptions were severe, to such an extent that Plaintiff's doctor produced a note indicating Plaintiff was not fit for full duty. As a result, BPD ultimately placed Plaintiff on a medical suspension in accordance with multiple BPD medical and fitness for duty policies. The medical suspension meant Plaintiff was placed on light duty, did not have police powers, could not effectuate arrests, could not act in a law enforcement capacity, and could not work overtime. The evidence shows that during that time, Plaintiff's superiors continued to discuss concern for Plaintiff's workplace performance. Then, on July 14, 2022, Plaintiff applied for and received FMLA leave to begin in August of 2022. While Plaintiff was out on leave, BPD transferred him to a different administrative role, consistent with the warnings they had given Plaintiff several times before and his belief that if there was one more perceived incident, he would be transferred.

From that synopsis, Plaintiff has brought a case alleging that BPD unlawfully interfered with his FMLA rights and retaliated against him for taking FMLA leave. At every turn, Plaintiff infuses unsupported speculation and other grievances into the record in an effort to defeat summary judgment. Plaintiff does so to such an extent that he relies almost exclusively upon documents produced after the discovery period closed. Indeed, discovery has been complete since October 17, 2025. (ECF No. 60). Yet, Plaintiff's opposition brief suggests that new material facts defeat

summary judgment, including those set forth in his attorney's "Statement of Facts" and a post-discovery Declaration he signed which raises new allegations not referenced in the other discovery materials.

### ii.      Transfer History

For approximately fourteen years, Plaintiff occupied various positions in the BPD. (*2016 Employment Summary*, ECF No. 69-3). On March 16, 2015, Plaintiff was transferred to the Internal Affairs Section, which is currently known as the Public Integrity Division ("PID"). *Id.* Plaintiff worked as a case detective, which required him to investigate "various allegations against officers." (*Lloyd Deposition*, ECF No. 69-4 at 7).[1] Plaintiff was promoted to Sergeant in 2017 and was transferred to the Central District on March 5, 2017. (*2016 Employment Summary*, ECF No. 69-3). Plaintiff returned to PID by way of a December 10, 2017 transfer, at which point he was assigned to the Command Investigation Unit ("CIU"). *Id.*; (*Lloyd Deposition*, ECF No. 69-4 at 13). In that role, Plaintiff investigated smaller cases to be handled at a command level. (*Lloyd Deposition*, ECF No. 69-4 at 13). Approximately six months later, Plaintiff transferred to a new assignment in the administrative section of PID. *Id.* at 14. Plaintiff was transferred again roughly twelve to eighteen months later to Office of Administrative Hearings ("OAH"), which is another subsection within BPD. *Id.* at 18. In that role, Plaintiff facilitated the Disciplinary Review Committee ("DRC") to decide "the punishment that [had] been set forth that [it was] executed in a timely fashion." *Id.* at 19. Upon transition, Plaintiff was aware that the previous working relationship between a sergeant and detective in that unit "had got[ten] so toxic" such that "it would be a bad situation." *Id.* at 74. Accordingly, he "inherited the backlog, and it just went downhill

---

[1] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document. If there are none, the Court is referring to the page number of the PDF.

from there." *Id.* Plaintiff received nonpunitive counseling as a result of the issues within OAH attributed to the backlog accumulated prior to Plaintiff's transfer.[2] *Id.* at 76; (*November 5, 2021, Non-Punitive Counseling Memo*, ECF No. 69-7).

In January 2022, Plaintiff returned to the administrative section of PID.[3] At that point, he resumed his PID responsibilities. (*Lloyd Deposition*, ECF No. 69-4 at 23). In PID, Plaintiff reported to Lieutenant Jerome Forrest as his first-line supervisor. *Id.* at 25; (*Declaration of Jerome Forrest*, ECF No. 69-8 at 2). Plaintiff's chain of command also included Captain Michael Newton, Major Jason Callaghan, and Deputy Commissioner Brian Nadeau. *See* (*Declaration of Jason Callaghan*, ECF No. 69-9, *Declaration of Brian Nadeau*, ECF No. 69-10).

### iii.    Performance and Relevant Feedback

It is unclear whether Plaintiff received two or three nonpunitive counseling memos. Two memos have been provided for the Court's review, one dated as early as July 18, 2016, yet still after Plaintiff was originally transferred into PID. *See* (*July 18, 2016 Non-Punitive Counseling*

---

[2] Plaintiff's counsel chose not to draft a statement of facts as part of Plaintiff's opposition brief for reasons unexplained in clear detail. *See* (EF No. 81-2). Rather, Plaintiff's counsel appended as an exhibit a purported statement of facts with admissions and various denials, that largely amounts to unsupported narrative and legal argument, with some exceptions in which Counsel cites to other portions of the record. Due to the nature of the instant motion and the Court's standard of review, the Court takes the purported "denials" seriously. Review of these denials, however, often shows that many underlying facts are not disputed to the extent it may seem at first blush. Where necessary, the Court will address those denials to determine what actually is disputed as a summary judgment analysis requires.

This is the first instance in which doing so is necessary. In response to BPD's statement of fact that Plaintiff was blamed for the backlog, Plaintiff's Counsel drafted a lengthy denial untethered to previous discovery in the case that argues a white male colleague received beneficial, disproportionate treatment when compared to Plaintiff, who is an African American male. (ECF No. 81-1 at 3). As will become a pattern, Plaintiff's basis for a "denial" is somewhat confusing, as Plaintiff does seem to agree that Plaintiff received some sort of blame and a nonpunitive counseling letter in light of the ultimate argument that such a response was unfair when compared to his white colleague. *See id.* Plaintiff does not dispute that the nonpunitive counseling letter was issued. *Id.* For the sake of clarity, Plaintiff's claims here are grounded only in the FMLA and alleged violation of Title VII for retaliation for taking FMLA leave. (ECF No. 7). As such, the Court is mindful of not confusing the issues and will therefore consider Plaintiff's statements related to race or other arguments that sound in Title VII co-comparator liability insofar as the Court strives to understand what is at issue for this case. To any extent that Plaintiff disputes whether the issuance of a non-punitive counseling memorandum was proper, such matters are not at issue in resolving the arguments about whether Plaintiff's FMLA leave and BPD's response to it was proper under the law.

[3] Defendant cites to Plaintiff's deposition, yet the portion to which Defendant cites does not support the proposition above. However, as Plaintiff does not challenge the assertion, the Court will accept it as true. (ECF No. 81-3 at 4).

*Memo*, ECF No. 69-11).  Plaintiff cites his attorney's argument to that effect as well as his response to interrogatories, in support of the assertion that he received only two nonpunitive counseling memos prior to November 12, 2021. (ECF No. 81-1 at 5).  Review of Plaintiff's Responses to Interrogatories show that "[s]ince the filing of this Complaint, this is my third non-punitive counseling memo and I was instructed on 11/12/21 that if I have one more incident, I will be kicked out of PID." (*Plaintiff's Responses to Interrogatories*, ECF No. 81-3 at 5).  Although it is unclear when exactly the third nonpunitive counseling memo was issued, the Court will consider it an undisputed fact that prior to the time of filing the Complaint in 2023, Plaintiff received three nonpunitive counseling memos; prior to November 12, 2021, Plaintiff received two nonpunitive counseling memos; and on November 12, 2021, Plaintiff was instructed that if he had one more incident, he would be "kicked out" of PID.  *Id.*

Months later, the record shows that Plaintiff failed to answer a duty call when he was assigned as the on-call duty sergeant in the summer of 2022 notwithstanding Plaintiff's attorney's argument stating Plaintiff has no memory of such an incident.  (ECF No. 81-1 at 5); *see also* (*Declaration of Jerome Forrest*, ECF No. 69-8 at 2-3) (describing an incident in June or July of 2022 in which Plaintiff did not appear for a duty call and other staff had to fill the position). Plaintiff's counsel's legal arguments on this issue will not be addressed in the facts section here.

In June 2022, the record shows that Plaintiff received a *Giglio v. United States* request from the U.S. Department of Justice. *See* (*June 14, 2022 Justice Department Giglio Request*, ECF No. 69-12, *August 2022 Performance Issues Emails*, ECF No. 69-13).  Plaintiff did not respond to that request until twenty-four days later and seven days prior to his deadline notwithstanding multiple follow ups.  *See* (*June 14, 2022 Justice Department Giglio Request*, ECF No. 69-12, *August 2022 Performance Issues Emails*, ECF No. 69-13).  The parties dispute the impact of the delay, how it

should be properly characterized, and the impact of multiple follow ups on Plaintiff's overall workplace performance. What is not disputed is the evidence showing the delay and other summer 2022 failures were not well-received by Plaintiff's chain of command. (*August 2022 Performance Issues Emails*, ECF No. 69-13) (listing five performance issues in June and July 2022).

On July 6, 2022, Plaintiff first sought sick leave related to his post-traumatic stress disorder ("PTSD"). (*Lloyd Deposition*, ECF No. 69-2 at 40-41). This sick leave request was not an FMLA leave request, and it seems that Plaintiff did not disclose initially that he requested sick leave due to his PTSD. Lt. Forrest initially denied his sick day request and approved it after resubmission on July 8, 2022.[4] *Id.* While Plaintiff was out sick, he did not submit a schedule roster that fell within his job responsibilities despite calls and follow up from Lt. Forrest. (*Roster Submission Emails*, ECF No. 69-15). Plaintiff's counsel again represents that this occurrence is "denied," yet concedes that Plaintiff indeed did not answer calls from Lt. Forrest on July 6, 2022 and July 7, 2022. It also appears to be conceded that Plaintiff did not send the schedule roster. Consistent with the July 12, 2021 warning, there is evidence in the record[5] showing that following this

---

[4] Plaintiff concedes that the initial denial of a sick day request and approval upon resubmission is not part of his present lawsuit. Plaintiff's counsel rigorously argues otherwise in the opposition brief, as will be explored in greater detail below. However, the Court observes the following portion of Plaintiff's deposition:

> Q: Okay, And so, you submitted leave that day you didn't report to work?
> A: Correct. It – it was denied, and then I had to resubmit the sick day because initially he denied it.
> Q: Okay. And this is for July 6th?
> A. Correct.
> Q: Okay. And, so, when you resubmitted it, did he approve it?
> A: Yes. After the second time, he approved it.
> Q: Okay. And to be clear, this initial denial and then approval is not part of your FMLA interference or retaliation claim; is that correct?
> A: Say that again?
> **Q: The—Lieutenant Forest [*sic*] initially denying your leave request on July 6th and then subsequently approving it is not part of your FMLA interference or retaliation claims; is that right?**
> **A: That's correct.**

(*Lloyd Deposition*, ECF No. 69-4 at 40-41) (emphasis added).

[5] Plaintiff's counsel denies BPD's statement of fact that DC Nadeau, Major Callaghan, and Lt. Forrest agreed it was in PID's best interest to transfer Plaintiff to another unit on the basis that she does not think the declaration is credible.

incident DC Nadeau, Major Callaghan, and Lt. Forrest agreed it was in PID's best interest to transfer Plaintiff to another unit. (*Declaration of Brian Nadeau*, ECF No. 69-10 at 6-7).

The Court finds the several other disputes over granular details[6] immaterial to the issues of whether Defendant interfered with Plaintiff's late-July 2022 FMLA leave request or retaliated against him for taking FMLA leave in August 2022. No matter the precise statements of counseling in 2016 and 2021, the nuances of BPD's reaction to the dysfunction at the OAH, or whether the OAH backlog is properly attributable to Plaintiff, Plaintiff did not seek leave (let alone FMLA leave) for his PTSD until the summer of 2022.

### iv. Plaintiff's FMLA Leave History

As stated previously, Plaintiff first took sick days on July 6 and 7 of 2022. One week later, on July 14, 2022, Plaintiff first submitted FMLA paperwork to Human Resources ("HR"). (*July 14, 2022 FMLA Paperwork Submission*, ECF No. 69-16). However, the paperwork omitted details necessary for approval without further action. Although Counsel for Plaintiff "denies" this fact, the ensuing paragraph concedes "Plaintiff's FMLA paperwork may not have had every detail necessary to complete." (*Counsel's Statement of Facts*, ECF No. 81-1 at 17). Plaintiff's deposition clarifies, "I was missing some information…Page 1 is not complete. Please indicate dates requested for leave of absence and reasons for leave. So it was kind of a back and forth just making sure that the paperwork was—had all the information they needed." (*Lloyd Deposition*, ECF No. 69-4 at 42-43). Plaintiff and HR accordingly engaged in an interactive process over the course of

---

(ECF No. 81-1 at 11). No matter whether Plaintiff finds it credible, the Court observes the evidence does exist. (*Declaration of Brian Nadeau*, ECF No. 69-10 at 6-7). Unsupported statements of Counsel's personal suspicion are not enough to generate triable issues.

[6] Again, review of Counsel's appended Statement of Facts shows that in several instances, Plaintiff does not actually dispute the underlying fact, i.e., whether a particular occurred; rather, Counsel raises legal arguments urging the Court to take a particular position concerning the fact or characterize it in some other manner. Because not every instance of unfair treatment is relevant to FMLA leave, the Court will not address these non-FMLA disputes in greater detail.

a few days to remedy the paperwork such that his application could be processed, and it was ultimately approved. *Id.* at 43-44.

Before BPD rendered its approval decision about Plaintiff's July 14, 2022 FMLA leave request, Plaintiff submitted a request for sick leave by way of BPD's payroll and attendance monitoring system known as Workday on July 18, 2022. (*Workday Leave Request History*, ECF No. 69-17 at 3); (*Lt. Forrest "Fitness for Duty" Emails and Attachments*, ECF No. 69-17 at 3).  In that request, Plaintiff "submitted Sick Leave via Workday with the effective date of August 1, 2022 through September 30, 2022," the same dates for his FMLA request. (*Lt. Forrest "Fitness for Duty" Emails and Attachments*, ECF No. 69-17 at 3).  However, Plaintiff's Workday leave request omitted medical documentation that is required for the approval of missing more than three consecutive days of work. *Id.* Plaintiff "denies" this fact but agrees that "there may be a distinction between Workday documentation and FMLA paperwork" because the FMLA leave request was supported by medical documentation.  (*Counsel's Statement of Facts*, ECF No. 81-1 at 18).  The Court can find no evidence of medical documentation accompanying the Workday leave request and will consider that fact undisputed.  It is undisputed that BPD's workplace policies require any request for sick leave for three or more consecutive days to include supporting medical documentation.  (*BPD Medical Policy*, ECF No. 69-19).

It appears that still prior to any decision on Plaintiff's July 14, 2022 FMLA leave request, Plaintiff sent the same to Lt. Forrest on July 21, 2022.  (*Lt. Forrest "Fitness for Duty" Emails and Attachments*, ECF No. 69-17 at 3).  Lt. Forrest observed that the FMLA leave paperwork submitted "the same time off as his sick leave in Workday." *Id.*  Lt. Forrest indicated he learned for the first time through Plaintiff's leave requests that Plaintiff suffers from PTSD and requested an evaluation at Mercy Public Safety Infirmary ("PSI") according to BPD's medical policy.  (*Lt. Forrest*

*"Fitness for Duty" Emails and Attachments*, ECF No. 69-17 at 3); (*BPD Medical Policy*, ECF No. 69-19).  Indeed, BPD's Fitness for Duty Evaluation Policy states that

> A supervisor may request a fitness for duty evaluation whenever he or she reasonably believes a medical or psychological condition might be preventing the member from performing their job functions in a safe and effective manner or that it could pose a direct threat to the member's safety or the safety of others. The need for a fitness for duty evaluation might become evident from the supervisor's own observations of the member or from reliable information received from a third-party…

(*BPD Fitness for Duty Evaluation Policy*, ECF No. 69-20 at 3).  Lt. Forrest submitted a formal request for a fitness for duty evaluation to the Administrative Duties Division ("ADD") on July 21, 2022.  (*Lt. Forrest "Fitness for Duty" Emails and Attachments*, ECF No. 69-17 at 2).

Plaintiff traveled out of town for a pre-planned leave to New Orleans for a family reunion from July 21-July 25, 2022.  (*Lloyd Deposition*, ECF No. 69-4 at 49-50).  Plaintiff returned to work on July 26, 2022.  However, Plaintiff was medically suspended because his doctor advised Plaintiff was unable to perform his job duties due to his PTSD.  (*Medical Suspension Order*, ECF No. 69-22 at 2).  Plaintiff received full pay and benefits while suspended on medical leave.  *Id.* at 3-4.  Plaintiff's duty status was changed from full duty to medically suspended pending further evaluation at Mercy PSI. *See id.*  On July 27, 2022 Plaintiff presented for an evaluation by Dr. Romarius Longmire, who determined that Plaintiff was not fit to perform the duties of a BPD officer.  (*PSI Discharge Paperwork*, ECF No. 69-24).[7]  From July 28-29, 2022, Plaintiff took sick leave because he had COVID-19.  (*Lloyd Deposition*, ECF No. 69-4 at 57).

Plaintiff commenced his FMLA leave period as decided upon with his doctor on August 1, 2022.  *Id.* at 50.  He received his FMLA leave approval on August 3, 2022, through an email from HR.  *Id.* Defendant states that "no one discouraged Plaintiff from taking his FMLA leave."

---

[7] ECF No. 69-24 has been filed under seal and is labeled "Exhibit 21."  Review of the briefs and exhibits shows that this notation is most likely a mistake and that it is meant to be Exhibit 22.

Contrary to Plaintiff's deposition testimony, Plaintiff's Counsel denies this fact because Lt. Forrest did initially denied and later approved Plaintiff's sick leave request (not FMLA leave) for July 6 and 7, 2022. From that assertion, Counsel states that Lt. Forrest "only exacerbated the symptoms of Plaintiff's PTSD and made him feel like he was being told he could not take FMLA leave." (*Counsel's Statement of Facts*, ECF No. 81-1 at 16). However, this is the very period Plaintiff testified is not part of his FMLA claim in his deposition, as stated above. (*Lloyd* Deposition, ECF No. 69-4 at 40). Yet, the record becomes blurry because Plaintiff's Counsel cites to the Declaration of Raymond Lloyd, signed on June 3, 2026, the day before Plaintiff filed his opposition brief. (*Lloyd Declaration*, ECF No. 81-10 at 2). Review of Defendant's Reply brief makes clear that this declaration and the allegations therein were not produced during discovery.

In Plaintiff's new Declaration, he changes his position to support Counsel's statement of facts. *Id.* The portions of Plaintiff's deposition, taken on July 31, 2025, contain no such statement, nor does Plaintiff's counsel point to any deposition statements to that effect. (*Lloyd Deposition*, ECF No. 69-4); (*Counsel's Statement of Facts*, ECF No. 81-1) (citing the *Lloyd Declaration*). The Declaration states the following:

> On [July] 6, 2022, I needed to go on leave due to issues with my PTSD. Lt. Forrest denied this leave.
>
> Lt. Forrest indicated via text that my request for a sick day was denied without reason, which forced me to have to justify my need for a sick leave by explaining my PTSD and medical history.
>
> I was forced to seek assistance from a Fraternal Order of Police ("FOP") representative to exercise my rights to go on leave for two days. I resubmitted my original sick leave request on July 7th, which was subsequently approved by Lt. Forrest.
>
> This opposition from my first sick day submission to my first line supervisor, Lt. Forrest only exacerbated the symptoms of my PTSD and made me feel like I was being told I could not take FMLA leave. I returned to work on July 8, 2022.

10

(*Lloyd Declaration*, ECF No. 81-10 at 2) (cleaned up). This statement is a stark deviation from Plaintiff's deposition testimony, which confirmed that Lt. Forrest's initial denial of Plaintiff's July 6 and July 7th sick leave "is not part of [his] FMLA interference or retaliation claims." (*Lloyd Deposition*, ECF No. 69-4 at 39-40). There is no evidence that Lt. Forrest told Plaintiff not to file for FMLA leave when he initially denied the sick leave request. There is no evidence that Lt. Forrest told Plaintiff not to file for FMLA leave before he did so a week later. There is no evidence that Lt. Forrest told Plaintiff his FMLA leave request would be denied when he filed it on July 14, 2022. There is no evidence of any BPD employee verbally discouraging Plaintiff from taking leave or warning that doing so would result in a transfer.

Plaintiff commenced his FMLA leave on August 1, 2022. That same day, Sergeant Anderson requested a fitness for duty evaluation for Mr. Lloyd under the Fitness for Duty Policy after reviewing Dr. Longmire's evaluation. (*August 1, 2022, Fitness for Duty Evaluation Request*, ECF No. 72). On August 2, 2022, Sergeant Anderson followed up with HR to learn whether Plaintiff's FMLA leave request had been approved. (*HR Follow Up*, ECF No. 73 at 2). HR did approve the FMLA leave request. (*FMLA Approval*, ECF No. 69-28). On August 8, 2022, Lt. Forrest also approved Plaintiff's overlapping Workday sick leave request. (ECF No. 69-29) ("Good afternoon Sgt. Anderson, I'm just informing you that Sgt. Lloyd's Workday will be approved. Also, at a glance Sgt. Lloyd has packed up his office before he left for FMLA with just a few personnel items remaining on his desk.").

Plaintiff presented for a PSI fitness for duty evaluation on August 11, 2022. (*Dr. Leeb Evaluation*, ECF No. 74). Dr. Leeb ultimately concluded that Plaintiff was not psychologically fit to return to full duty and should continue in a light duty capacity. *Id.* at 3.

        *v.      Final PID Transfer*

At around that same time, Major Callaghan made a formal request to transfer Plaintiff out of PID "due to performance issues." (*Callaghan Transfer Request*, ECF No. 69-32 at 2). Captain Daniel Popp initiated a transfer to the Telephone Reporting Unit ("TRU") because he misunderstood Plaintiff's eligibility status.[8] (*Popp Transfer Emails*, ECF No. 69-33). The mistake was corrected on August 15, 2022. (*Transfer Mistake Emails*, ECF No. 69-35). Plaintiff was ultimately transferred to the Northern District to work in an administrative capacity for the ADD. (*ADD Transfer*, ECF No. 69-41). Plaintiff remained on FMLA leave until September 30, 2022, at which point he returned to BPD to the Northern District.

Plaintiff submitted retirement paperwork on August 1, 2022, the same day he started his FMLA leave, citing "declining medical." (*Lloyd Calendar*, ECF No. 69-42 at 2); (*Counsel's Statement of Facts*, ECF No. 81-1 at 25). Plaintiff's retirement date was January 1, 2023. (*Lloyd Deposition*, ECF No. 69-4 at 69).

### vi.      Plaintiff's Additional Facts

Counsel's Statement of Facts asserts several other facts, largely concerning racially discriminatory language in 2020. (ECF No. 81-1 at 27). This is somewhat confusing from a causation standpoint, as the evidence must show it was the FMLA leave and not another protected trait that resulted in the transfer. It is unclear how this evidence fits into the FMLA framework. Plaintiff also describes a contentious history at the OAH, resulting in allegations of a disparity in treatment between Plaintiff and his white colleagues a year before his FMLA leave. *Id.* at 30. Plaintiff's counsel argues in the Statement of Facts that "the hostile work environment within PID

---

[8] Plaintiff's Counsel emphasizes that Captain Popp is a white male and that she is unaware of any documentation showing a reprimand or other discipline imposed on him for the mistaken transfer. (*Counsel's Statement of Facts*, ECF No. 81-1 at 23). She argues this is of particular interest when viewed in comparison to how Plaintiff's alleged mistakes were made but does not elaborate on how any such comparison relates to the claims for FMLA interference or retaliation. *Id.*

was causing Plaintiff's PTSD condition to flare up…" *Id.* at 32.  Plaintiff's counsel does not describe how these six additional pages of mixed fact and legal argument impact the claims brought under the FMLA.

Concerning leave, however, Plaintiff's counsel offers greater detail of various conversations that took place prior to his leave and transfer.  For example, Plaintiff notes that on July 19, 2022, DC Nadeau asked Plaintiff to print BPD's policy concerning transfers, details, and filling vacancies.  (*Lloyd Declaration*, ECF No. 81-10 at 2-3).  In his Declaration, Plaintiff states that those actions discouraged him from taking FMLA leave and threatened him for taking leave, though Plaintiff does not deny having filed his FMLA paperwork or taking the leave BPD ultimately approved per his request.  *Id.* at 3. No such allegation exists in Plaintiff's deposition, even in response to a catch-all question asking if there is any other information part of Plaintiff's claims. (*Lloyd Deposition*, ECF No. 69-4 at 81) ("Is there anything else that you are claiming as a part of your FMLA interference claim in Count 1 [and Count 2]? Not right now.").  Plaintiff further asserts that the Northern District role required Plaintiff to engage in different duties and no longer afforded union payments for a uniform.  *Id.* at 3-4. BPD clarifies that the Northern District role did not include union payments for a uniform because no uniform was required, making payment improper under the Clothing Allowance Policy.  *See* (*BPD Uniform and Equipment Policy*, ECF No. 69-45; *BPD Clothing Allowance Policy*, ECF No. 69-44).  Although Plaintiff describes scheduling and task differences, Plaintiff concedes that both roles are categorized as administrative. (*Lloyd Declaration*, ECF No. 81-10 at 2-3).  Plaintiff emphasizes that one such difference included "more physical labor," though Plaintiff does not elaborate to explain what kind of labor he performed or what change in job tasks required him to do physical labor.  *See id.* No such statement appears in Plaintiff's deposition.  There, he testified that he remained a sergeant,

he received the same base rate of pay, and his job responsibilities included "enter[ing] some information regarding some administrative documents that they had at the district" and "mak[ing] sure the front desk was taken care of, any calls that came through." (*Lloyd Deposition*, ECF No. 69-4 at 27-28).

vii.    <em>Administrative History</em>

On December 15, 2022, Plaintiff filed a complaint with the Wage and Hour Division (the "WHD") of the U.S. Department of Labor (the "DOL"). *See* (*Case Statement Email*, ECF No. 81-13) ("We have found Baltimore Police Department in violation of your FMLA rights."); *see also* (*Lloyd Declaration*, ECF No. 81-10, at 5) ("On December 15, 2022…I filed a complaint with the Wage and Hour Division "WHD" of the U.S. Department of Labor "DOL"). The DOL opened an investigation for which Plaintiff gave a personal interview. *See* (*Lloyd DOL Interview*, ECF No. 81-12). When a representative with the WHD informed Plaintiff of his case disposition, he no longer worked for BPD and the DOL was "unable to provide [him] with any remedies." (*Case Statement Email*, ECF No. 81-13).

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party can make such a showing by demonstrating the absence of any genuine dispute of material fact or by showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

14

Therefore, if there are factual issues "that properly can be resolved only by a finder of fact because [those issues] may reasonably be resolved in favor of either party[,]" then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250.

"When ruling on a motion for summary judgment, the [C]ourt must construe the facts alleged in the light most favorable to the party opposing the motion." *U.S. ex rel. James Commc'n, Inc. v. LACO Elec., Inc.*, No. DKC 14-0946, 2015 WL 1460131, at *2 (D. Md. Mar. 27, 2015) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008)). A party bearing the burden of proof on a particular claim must factually support each element of his or her claim. *Celotex*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id.*

## III.    DISCUSSION

As an initial matter, Defendant urges the Court to disregard Plaintiff's Opposition brief in entirety, and if not, to at least disregard Counsel's Statement of Facts. Defendant argues that the Plaintiff's brief circumvents Local Rule 105.3 because "Plaintiff's actual Opposition is 26 pages long. ECF No. 81. However, this document contains no facts. Instead, it refers the Court to an additional 39-page document, separately filed and titled 'Statement of Genuine Issues of Material Fact in Dispute.'" The Court observes that while much of Defendant's concern with Plaintiff's approach is well-founded, neither party's briefing effort has fully complied with this Court's requirements under Local Rule 105.3. For example, Defendant filed its consent motion for leave to exceed the page limit simultaneously with its motion that exceeded the page limit, which the Court granted in the interest of moving the nearly three-year litigation at bar forward. *See, e.g.*, *Visual Mining Inc. v. Ziegler*, No. PWG– 12–3227, 2014 WL 690905, at *6 (D. Md. Feb. 21, 2024) (denying a motion for leave to file excess pages when an improper brief was filed

simultaneously with a motion for leave and the parties failed to demonstrate good cause). Seeing as that motion was filed by consent and at least makes some effort to comply with the Local Rules, the Court found good cause notwithstanding the procedural deficiency.

Plaintiff's brief presents a different scenario that more clearly attempts to side-step the Local Rules. Defendant is correct that Local Rule 105.3 imposes a thirty-page limit on memoranda in support of motions in opposition. Loc. R. 105.3 (D. Md. 2025). Indeed, "[c]umbersome filings…are a considerable drain on judicial resources." *Sampson v. City of Cambridge, Md.*, No. WDQ–06–1819, 2008 WL 7514365, at *3 (D. Md. June 5, 2008). Plaintiff's briefing approach illustrates this very issue. The Opposition brief rarely cites any exhibit other than the appended Statement of Facts. Although the Court does recognize that in some instances, the Statement of Facts refers to other exhibits, Defendant's concern that the purported statement of facts includes many unsupported statements of legal argument, and assertions that are contradicted by the discovery in the case (and Plaintiff's Deposition) is well-taken. It is true that the Opposition brief repeatedly cites to Counsel's own assertions of fact, which often appear to be legal argument or tethered only to the June 3, 2026 Declaration not produced in (and in conflict with) discovery. As a result, it is not clear from the Opposition brief what is a fact grounded in the record developed during discovery and what is a late-stage effort to survive summary judgment. The effort required to extract true statements of fact and locate them somewhere in the record strains judicial resources. This approach creates a convoluted record requiring additional cross-referencing between the brief, the statement of facts, and a six-hundred eighty-three-page record. Due to the nature of the citations, the Court has expended the resources necessary to cross reference each statement to determine what the record shows, what is actually disputed, and what, as it turns out, is not disputed contrary to Counsel's assertions.

Although Plaintiff has arguably violated the local rules by filing his statement of facts as a purported exhibit, "striking [his] opposition in full as a result of this transgression is unwarranted." *Sampson*, 2008 WL 7514365, at *3. The Court has no way to determine the Plaintiff's facts without considering the separate exhibit. *See id.* (considering a separately filed statement of facts notwithstanding the "considerable drain on judicial resources"). Doing so is necessary, as resolving a summary judgment motion requires consideration of the facts the parties dispute. In the interest of an efficient and fully-informed resolution of the Motion for Summary Judgment, the Court will consider the motions as filed. The Court will not, however, consider unsupported statements that appear in the exhibit or construe legal argument as fact or that conflict with the record. To the extent that the lines blur, the Court will address the issue as necessary.

> **A.    The Court Declines to Grant Summary Judgment on the Defendant's Administrative Exhaustion Argument**

Defendant first argues that Plaintiff "has ignored well-established rules of labor law that prohibit this action from being brought before this Court." (ECF No. 69-2 at 18). Defendant urges that the exclusive contract remedies set forth in the Memorandum of Understanding (the "MOU") between the Fraternal Order of Police, Lodge 3 and BPD requires Plaintiff to follow its procedure, thereby rendering the present lawsuit a "purely labor issue" between employer and its employees in contravention of the MOU. *Id.* at 20. Yet, Defendant made no such argument at the motion to dismiss juncture. The Court will consider the argument because failure to exhaust administrative remedies does appear as a defense in the Answer, but is unclear why this is the first instance in which Defendant has brought this jurisdictional argument before the Court. Plaintiff correctly summarizes the WHD complaint history in response to this argument, countering that "because his claims are pursuant to the FMLA, Plaintiff is not required by law to exhaust his administrative remedies." (ECF No. 81 at 5). Plaintiff continues, "BPD cannot create an exhaustion bar from a

union grievance procedure unless the governing statutory scheme makes that process a prerequisite to the federal FMLA claim." *Id.*

The Court agrees.  "Administrative exhaustion is not required to bring a FMLA suit." *Anausie-Howard v. Todd*, 920 F.Supp. 2d 623, 630 n.22 (D. Md. 2013), *aff'd*, 615 F. App'x 119 (4th Cir. 2015) ("Administrative exhaustion is not required to bring a FMLA suit").  This Court has recognized that in any event, the WHD, not the EEOC "is the proper administrative body to adjudicate a FMLA complaint." *Id.* "Unlike Title VII and the ADA, there are no administrative prerequisites that must be satisfied before filing an FMLA suit in federal court." *Wailes v. DeJoy*, Civil Action No.: 7:22-cv-12, 2023 WL 2695151, at *5 (W.D. Va. Mar. 29, 2023) (quoting *Edwards v. Heatcraft, Inc.*, No. 7:05-CV-36 (HL), 2006 WL 3159945, at *4 (M.D. Ga. Nov. 2, 2006)).  Defendant does not cite any case law that addresses the FMLA.  Rather, Defendant argues Plaintiff attempts to sidestep the MOU requirements by asking the Court to "invalidate the FOP and MOU and deem his transfer illegitimate." (ECF No. 69-2 at 21).  The Court can find no basis upon which such a conclusion would be proper, as Plaintiff is not asking the Court to invalidate the FOP and MOU or even deem his transfer illegitimate.  Rather, Plaintiff asks this Court to find that genuine issues of material fact exist underlying his claim for FMLA interference and retaliation.  Indeed, all policies in controversy are BPD policies, not those of the FOP or MOU.

Defendant's reply continues to conflate the cause of action here with a request to challenge an involuntary transfer.  Plaintiff's claim is not untethered to a specific statutory basis as Defendant would like the Court to find. The Court observes one North Carolina case neither party discussed in which the court concluded a plaintiff's FMLA claim was a disguised attempt to sidestep union requirements.  *Green v. Am. Airlines, Inc.*, CIVIL ACTION NO. 3:20-CV-505-DCK, 2022 WL 325375, at *3-4 (W.D.N.C. Feb 2, 2022).  However, that case turned on a finding that ruling for

the plaintiff required the interpretation of a union contract to hold that under that contract, the plaintiff was entitled to pay and benefits even when he was not qualified to work. *Id.* at \*4. No such comparable finding exists here because all of the policies are BPD's. As the Court sees it, Plaintiff's central theory is that BPD interfered with Plaintiff's FMLA by taking various actions not governed by the MOU and retaliated against him by transferring him after he took leave. Thus, no interpretation of the MOU is required to determine whether the alleged interference or retaliation took place. The Court can find no basis upon which a conclusion that some standard other than the FMLA should govern the requirements of Plaintiff's FMLA claim based on this record. Therefore, the Court is unpersuaded to grant summary judgment on this basis.

### B.     There is No Evidence of FMLA Interference Beyond Unsupported Speculation, Nor is there Any Evidence of Prejudice

Plaintiff argues that there exist genuine issues of material fact on the questions of interference and prejudice. To begin, the distinction between an interference claim and a retaliation claim under the FMLA "is not always clear." *Edusei v. Adventist Healthcare, Inc.*, Civ. No. DKC-13-0157, 2017 WL 3345051, at \*6 (D. Md. July 7, 2014). "'[T]he interference claim merely requires proof that the employer denied the employee…entitlements under the FMLA, while the retaliation claim requires proof of [the employer's] retaliatory intent.'" *Sherif v. Univ. of Md. Med. Ctr.*, 127 F. Supp. 3d 470, 477 (D. Md. 2015) (quoting *Bosse v. Balt. Cty*, 692 F. Supp. 2d 574, 588 (D. Md. 2010)). To prevail on an FMLA claim, a plaintiff must prove (1) that he is entitled to an FMLA benefit; (2) that his employer interfered with the provision of that benefit; and (3) that the interference caused him harm. *Adkins v. CSX Trans.*, 70 F.4th 785, 796 (4th Cir. 2023). The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1). Because BPD did approve Plaintiff's FMLA paperwork, the issue before the Court is

whether a reasonable jury could find that BPD restrained or interfered with the FMLA leave BPD ultimately approved.

            1.         <u>There is No Evidence that BPD Interfered with Plaintiff's FMLA Rights</u>

Plaintiff's arguments of an interference do not align with the usual notions of interfering conduct. *See, e.g.*, *Bosse*, 692 F. Supp. 2d at 587 (finding triable issues of interference when the defendant "repeatedly denied [the plaintiff's] FMLA requests or required additional documentation that exceeded the documentation required for non-FMLA leave"); *Sopel v. DynCorp. Int'l*, Civil Action No. ELH-23-430, 2023 WL 3043766, at *4 (D. Md. Apr. 21, 2023) (noting that refusing to grant FMLA leave and discouraging an employee from using such leave constitutes interference). Relying on Counsel's statement of facts, Plaintiff lists the following grievances in support of his interference arguments: (1) the July 6th sick leave request that Lt. Forrest initially denied but subsequently approved; (2) DC Nadeau asked Plaintiff to print out the transfer policy in the days following his FMLA submission; (3) Plaintiff was medically suspended beginning on July 26, 2022; and (4) Plaintiff felt forced into retirement after learning he had been involuntarily transferred "without reason.[9]" (ECF No. 81 at 12-13). First, Plaintiff argues—notwithstanding his deposition statements in flat contradiction to such an argument—that Lt. Forest interfered with Plaintiff's FMLA leave when he denied and subsequently approved the July

---

[9] Plaintiff repeatedly compares how BPD treated other white colleagues in comparison to Plaintiff. Such a disparity in treatment, however, does not create a triable FMLA interference issue. Plaintiff, as "the master of his complaint," *Custer v. Sweeney*, 89 F.3d 1156, 1165 (4th Cir. 1996), has the discretion to choose which claims to allege. *United States v. Jones*, 125 F.3d 1418, 1428 (11th Cir. 1997). That Plaintiff could have brought suit under Title VII for different reasons has no bearing on whether Plaintiff has sufficiently generated triable issues under the FMLA. *See, e.g., Hunter v. Scott*, No. 1:07-cv-448, 2007 WL 2381988, at *1 (S.D. Ala. Aug. 16, 2007) ("The mere fact (if it be a fact) that the plaintiff could have brought a [different] claim is simply irrelevant.").

Plaintiff further proscribes to BPD "full[] inten[t] to interfere with [Plaintiff's' FMLA leave…" (ECF No. 81 at 13). Again, these points do not generate a triable issue. Although interference and retaliation claims are similar, "an interference claim alleges that the employer failed to provide a substantive right, regardless of the fact of whether other employees were treated more or less favorably." *Edusei v. Adventist Healthcare, Inc.*, Civil Action DKC 13-0157, 2014 WL 3345051, at *6 (D. Md. July 7, 2014).

6, 2022, sick leave request. Plaintiff argues that under the June 2026 Declaration, the initial denial exacerbated Plaintiff's PTSD, which related to visions of Plaintiff in a casket and other disturbing visions of death. (*Lloyd Deposition*, ECF No. 69-4 at 39). Plaintiff does not explain how a July 6, 2022 denial, which was subsequently approved, interfered with or discouraged Plaintiff from taking the FMLA leave he submitted on July 14, 2022. In fact, there is no evidence that upon the initial denial that Lt. Forrest had any notice that the sick day request might arise from a protected illness. Nor is there any evidence that Lt. Forrest or anyone else at BPD made any discouraging statements to Plaintiff in connection to any sick leave or FMLA leave request.

To begin, under the "sham affidavit" doctrine, a plaintiff may not "survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 527 (D. Md. 2014) (quoting *Zimmerman v. Novartis Pharmaceuticals Corp.,* 287 F.R.D. 357, 362 (D. Md. 2012) (other citations omitted)); *see also Angelini*, 464 F. Supp. 3d at 781 (noting that a party "may not avoid summary judgment by submitting contradictory evidence" with regard to earlier assertions, and allowing a party to do so would "greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.") (other citations omitted).

The June 3, 2026 Declaration does exactly that—Plaintiff changes his stance that the July 6-7, 2022 sick leave denial and approval was not part of his FMLA claim and does not explain why the denial and approval should now be part of the case. Nor does Plaintiff explain why he has new alleged damage of exacerbated PTSD from a denial and subsequent approval he testified is not part of his case more than a year earlier. (*Lloyd Declaration*, ECF No. 81-10). As such, the Court is not inclined to find that either the new Declaration or Counsel's Statement of Facts relying

on the new Declaration is enough to generate a genuine issue. However, even if the testimony was consistent or properly explained, no reasonable juror could find that the initial denial and approval interfered with Plaintiff's FMLA leave because it is undisputed that (1) Plaintiff filed his FMLA paperwork a week later; (2) there is no evidence Lt. Forrest made any discouraging statements; (3) Lt. Forrest did not know that the "sick leave" request had anything to do with Plaintiff's PTSD until—at the earliest—after he denied the sick leave request, and at the latest, after Plaintiff submitted his FMLA paperwork; and (4) when Lt. Forrest learned of Plaintiff's PTSD, he assisted Plaintiff through the PSI process to determine whether it was safe for him to continue working. (*Lloyd Declaration*, ECF No. 81-10 at 2) ("Lt. Forrest indicated via text that my request for a sick day was denied without reason, which forced me to have to justify my need for a sick leave by explaining my PTSD and medical history); (*Forrest Declaration*, ECF No. 69-8 at 5); (*July 21, 2022 Fitness for Duty Emails*, ECF No. 70). Moreover, this initial "sick day" request was not filed under the FMLA, and contained no initial explanation as to why sick leave was sought, whereas Plaintiff's FMLA requested a leave date of August 1, 2022 and was supported by medical documentation. When Plaintiff provided the proper information and request, Defendant approved it, and Plaintiff took leave. *See Wall v. Mountaire Varms Inc.*, No. 5:25-CV-36-D, 2026 WL 1735388, at *11 (E.D.N.C. Jun. 11, 2026) (granting a summary judgment motion on an interference claim when a company considered a plaintiff's failure to provide proper notice rather than the leave itself and then approved all of the plaintiff's FMLA requests). Further, Plaintiff testified that no one discouraged him from using his FMLA leave once approved. (*Lloyd Deposition*, ECF No. 69-4 at 80-81).

Next, Plaintiff states that BPD interfered with his FMLA rights because DC Nadau entered his office unannounced and asked Plaintiff to print the transfer policy in July 2022. (*Lloyd*

*Declaration*, ECF No. 81-10).   First, this new allegation violates the sham affidavit rule as described above.  There is simply no evidence that this event discouraged Plaintiff from taking FMLA leave beyond Plaintiff's unsupported speculation and his subjective statement that the later approved denial caused him distress. Plaintiff testified in his deposition that he did not know if DC Nateau knew about his FMLA request on July 19, 2022.   (ECF No. 69-4 at 72).   That notwithstanding, Plaintiff insists that DC Nadeau's request that Plaintiff print out a transfer policy after he submitted his FMLA paperwork caused him to feel threatened.  (ECF No. 81 at 12).  However, it is undisputed that BPD did approve the FMLA request and sought various medical evaluations of Plaintiff's mental health to determine whether he could remain on full duty as soon as they were aware of his PTSD.  Indeed, BPD's Medical Policy and Fitness for Duty Policy (ECF Nos. 69-19, 69-20 respectively) require all members to be fit for duty "in a safe and effective manner."   Moreover, when Plaintiff submitted paperwork that the parties agree was missing necessary information for approval, HR assisted Plaintiff in fixing the paperwork by way of a back-and-forth email exchange.

In *Courtney-Pope v. Board of Education of Carroll County,* this Court addressed similarly subjective allegations under the FMLA, such as an employer's decision to ignore the plaintiff's emails or a change in demeanor that the plaintiff alleged made her sleeping, thinking, and emotional reactivity more difficult.  *Courtney-Pope v. Bd. of Educ. of Carroll Cnty.*, Civil Action No. ELH-16-4055, 2019 WL 4447246, at *18 (D. Md. Sept. 17, 2019).  There, the Court concluded that even if those "problematic" claims constituted "discouraging treatment," those facts do not establish FMLA interference at the very least on the issue of prejudice.  *Id.* at *20.  Although the Court denied summary judgment on the FMLA claim based on a much different allegation that the plaintiff was docked pay for forty-five minutes of FMLA leave, the Court's reasoning concerning

the subjective complaints provides guidance here. *See id.* Without more, the post-discovery allegation that Plaintiff felt threatened by printing out a BPD transfer policy is not enough to survive summary judgment.

Turning now to the argument that placing Plaintiff on a medical suspension constitutes FMLA interference, Plaintiff states that the culmination of his listed grievances in conjunction with the medical suspension constitutes interference. The Court disagrees. The record shows undisputed evidence that the nature of Plaintiff's medical documentation and self-reported statements created a legitimate concern that he was not fit for duty under BPD's policies. (*BPD Medical Policy,* ECF No. 69-19, *BPD Fitness for Duty Policy*, 69-20). Plaintiff's own doctor advised BPD that he was not fit for duty. (Medical Suspension Order, ECF No. 69-22 at 2); (*PSI Discharge Paperwork*, ECF No. 69-24). To now say that BPD violated the FMLA by taking his and his doctor's reports about his mental condition seriously is hardly substantiated by the record. Nor does Plaintiff cite to any case law in support of such a notion. There is simply no evidence that putting Plaintiff on a paid, medical suspension under the fitness for duty policy somehow interfered with Plaintiff taking FMLA leave or discouraged him from doing so. The evidence shows that the suspension had nothing to do with taking FMLA leave; rather, it was an effort to preserve Plaintiff's safety. Plaintiff does not even articulate why this action discouraged him from going on the FMLA leave he did take.

Finally, Plaintiff argues that the involuntary transfer to the Northern District constitutes FMLA interference. To that end, Plaintiff relies on Counsel's statement of facts to argue "BPD'S FMLA policy required Plaintiff's position to be held open for him and only forfeited if he failed to return by the end of the approved period" and that the transfer "perpetuated Plaintiff's harm in being involuntarily transferred despite returning to work by the end of the approved FMLA leave

24

period." (ECF No. 81 at 12).  However, Plaintiff's representation of FMLA interference law is only partially correct.  29 U.S.C. § 2614(a)(1) requires that a plaintiff must be restored to *either* his original, pre-leave position or to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." Indeed, "an employee does not have an absolute entitlement to restoration of his pre-leave position after taking FMLA leave." *Csicsmann v. Sallada*, 211 F. App'x 163, 166 (4th Cir. 2006) (citing *Yashenko v. Harrah's NC Casino, Co.*, 446 F.3d 541, 549 (4th Cir.2006)). "[F]ederal regulations clarify that the requirement of equivalent terms and conditions of employment "does not extend to de minimis or intangible, unmeasurable aspects of the job." 29 C.F.R. § 825.215. Examples of terms and conditions that should be equivalent are the employee's work schedule or his place of work: physical and temporal aspects of the job." *Id.*

Relying on Plaintiff's deposition testimony, Defendant argues that any change in Plaintiff's job responsibilities were de minimis as a matter of law.  Specifically, Plaintiff testified that he remained a sergeant, he received the same base rate of pay, and his job responsibilities included "enter[ing] some information regarding some administrative documents that they had at the district" and "mak[ing] sure the front desk was taken care of, any calls that came through." (*Lloyd Deposition*, ECF No. 69-4 at 27-28). It is undisputed that his previous role was administrative in nature. *See id.* at 54 (describing full duty tasks as "admin").  He further indicated he no longer received a clothing allowance and that he could not work overtime because he was medically suspended and limited to light duty. *Id.* at 27.  At no point in the deposition does Plaintiff testify to physical labor as part of his job responsibilities in the administrative office at the Northern District. *See generally id.*  Thus, under the sham affidavit rule above, the Court is not inclined to find that the sole conclusory assertion in Plaintiff's June 3, 2026 Declaration that he was

25

performing unspecified physical labor is enough to survive summary judgment. In all other instances, Plaintiff's own testimony confirms that the Northern District job was administrative in nature with the same base pay.

Turing to the issue of the clothing allowance, BPD's Clothing Allowance policy states that "[m]embers assigned to the administrative functions…are not eligible to receive a clothing allowance." (*BPD Clothing Policy*, ECF No. 69-44 at 2). Plaintiff testified PID would have made the decision to revoke his clothing allowance. (*Lloyd Deposition*, ECF No. 69-4 at 68-69). Defendant correctly characterizes this deduction as de minimis, seeing as the policy permits quarterly installments of $125.00, which equivalates to roughly under $50.00 per month. Plaintiff characterized the clothing allowance value as "just a little, so to speak." *Id.* at 7. Moreover, the inability to work overtime was simply a product of being placed on medical suspension in view of Plaintiff's doctor notes. *Csicsmann*, 211 Fed.Appx. at 166 (finding no FMLA violation where Plaintiff's salary, title, bonus eligibility, health care, and retirement benefits remained unchanged); *see also Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 188–89 (4th Cir. 2017) (affirming summary judgment for the defendant where the plaintiff was reinstated to a position where he received the same pay and benefits, continued to work at the same work site, reported to the same supervisor, and his duties remained focused on business development); *Anderson v. Lowe's Home Centers, Inc.*, No. 3:06-3409-CMC-JRM, 2008 WL 11462954, at *21 (D.S.C. May 28, 2008) (citing cases concluding that more physical labor, longer hours, changes in administrative duties, and lessened prestige or visibility are de minimis differences and, therefore, the plaintiffs were restored to equivalent positions), *Report and Recommendation adopted by* 2008 WL 4177270 (D.S.C. Sept. 4, 2008). Here, Plaintiff concedes that the administrative job involved comparable tasks and base pay. There is no evidence of a change in benefits or eligibility deficiencies; indeed, Plaintiff

retired a year later. *Csicsmann*, 211 Fed.Appx. at 166. Finding only a change in a clothing allowance that amounted to less than $50 per month for a uniform Plaintiff did not need, the undisputed evidence simply does not show the kind of evidence necessary to survive summary judgment. *Anderson*, 2008 WL 11462954, at *21. Plaintiff has generated no evidence from which a jury could conclude that he was not restored to a substantially similar position.

Ultimately, the record shows a reasonable person would not find BPD's actions discouraging and would feel that taking the requested FMLA leave was permitted—as Plaintiff here did. Therefore, no reasonable jury could find on this record that BPD interfered with Plaintiff's FMLA leave. Therefore, the Court must grant summary judgment for failure to generate evidence of interference.

### 2.    There is No Evidence Plaintiff Suffered Prejudice

However, even if any of the above actions constitute interference, there is no evidence of prejudice. Indeed, not all undesirable employment decisions constitute prejudice, as "[t]he FMLA does not prevent an employer from terminating an employee for poor performance, misconduct, or insubordinate behavior." *Vannoy v. Fed. Rsrv. Bank of Richmond*, 827 F.3d 296, 304-05 (4th Cir. 2016). Thus, "an employer may avoid liability if it shows it would have taken the contested adverse employment action regardless of the employee's FMLA leave." *Roberts v. Gestamp West Virginia, LLC*, 45 F.4th 726, 732–33 (4th Cir. 2022); *see also Mercer v. Arc of Prince George's Cty,* 532 F. App'x 392, 396 (4th Cir. 2013) (affirming summary judgment for employer on an interference claim when the defendant "provided evidence that it would have terminated [the plaintiff] for poor performance regardless of her FMLA leave, and [the plaintiff] has not presented evidence that would allow a jury to conclude otherwise"); *Ward v. Columbia Bank*, CCB-16-3606, 2018 WL 690883, at *6 (D. Md. Feb. 2, 2018) (granting summary judgment to employer on an interference claim because employee could not show prejudice); *Avant v.*

27

*Southern Maryland Hosp., Inc.*, No. GJH-13-02989, 2015 WL 435011, at *11 (Feb. 2, 2015) (granting summary judgment for employer because "it is not enough that [the defendant] simply interfered with [the plaintiff's] ability to exercise her FMLA rights…[The plaintiff] is still required to show that the [defendant's] interference with her FMLA rights somehow prejudiced her," and employee did not contend that the interference caused her any harm or loss).

In those instances when the alleged interference occurs before the adverse employment action, "the employee must first prove that the interference caused the adverse employment action before the burden shifts to the employer to prove it would have taken the same action absent the interference." *Hannah P. v. Haines*, 80 F.4th 236, 244 (4th Cir. 2023). To that extent, the line can blur between a retaliation claim and the prejudice element of an interference claim. *See id.* The Court will consider the facts as argued under each cause of action.

Here, the undisputed evidence shows that Plaintiff received two non-punitive counseling memos in 2021 and as of that November, he knew he "had one more strike" or "one more incident" before he would be "kicked out" of PID due to performance issues. (*Lloyd Deposition*, ECF No. 69-4 at 78, 80). Defendant cites three other issues that at the very least raised concerns about Plaintiff's performance in June of 2022, such as Plaintiff's failure to respond to the *Giglio* request without multiple follow ups and his failure to send a downtown deployment schedule. (. Contrary to Counsel's Statement of Facts, the evidence does show that Plaintiff's work performance came into controversy before Plaintiff filed his FMLA leave paperwork. Moreover, the transfer request cites to "performance issues" as the reason for transfer. While the transfer timeline overlapped with Plaintiff's FMLA leave, there is simply no evidence beyond Plaintiff's unsupported speculation to dispute the well-documented performance controversy, as well as Plaintiff's

knowledge that he had "one more incident" before he would be kicked out.  The record shows several.

As such, the only reasonable conclusion is that BPD would have transferred Plaintiff out of PID regardless of his FMLA leave.  Against the backdrop above, no reasonable jury could find that any reason other than Plaintiff's work performance caused his transfer.  Therefore, BPD has shown undisputed evidence that they would have transferred him irrespective of the FMLA leave request, and there is no evidence from which a reasonable jury could conclude that Plaintiff was prejudiced by the transfer.

The Court must grant summary judgment on Count I.

**C.      There is No Evidence of Adverse Employment Action and Insufficient Evidence of Causation Necessary to Survive Summary Judgment**

To establish a prima facie case of retaliation under the FMLA, an employee must show (1) that he engaged in a protected activity, (2) that his employer took an adverse action against him, and (3) that there is a causal connection between the protected activity and the adverse action. *Yashenk.,* 446 F.3d at 551.  An adverse employment action is one "that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007).   In the context of a retaliation claim, a plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (citations and internal quotation marks omitted); *see also Bosse.*, 692 F. Supp. 2d at 588 (applying the *Burlington* standard in the FMLA retaliation context).  After having made out a prima facie case, FMLA retaliation claims may rest on circumstantial evidence evaluated under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Once the plaintiff

proffers evidence establishing his prima facie case, and the employer offers a non-retaliatory reason of the adverse action, the plaintiff "bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation."

For the reasons explored above, there is no evidence of an adverse action such that Plaintiff can state a prima facie case because Plaintiff was transferred to an equivalent position. In view of the details explored above, no reasonable employee would have found this transfer materially adverse such that they would not have filed for FMLA leave in the future. However, even if the Court assumes a prima facie case has been stated, Plaintiff has failed to establish that BPD's reason for transfer is a mere pretext. As stated previously, Plaintiff's performance issues are well-documented (*August 2022 Performance Issues Emails*, ECF No. 69-13), and Plaintiff points to no evidence to the contrary other than his unsupported speculation. Indeed, "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate non-discriminatory reasons for a discharge." *Vannoy*, 827 F.3d at 305 (quoting *Dockins v. Benchmark Commc'ns*, 176 F.3d 745, 749 (4th Cir. 1999)).

Although Plaintiff repeatedly states that Plaintiff's performance issues are mere pretext, there is no evidence on the record to support such a notion. The undisputed evidence shows that BPD reviewed Plaintiff's FMLA paperwork, approved his leave, and in accordance with BPD policy, placed Plaintiff on a light duty capacity based on his doctor's advice. In view of the record as a whole, there is simply no evidence to support Plaintiff's speculative theory of pretext. Therefore, the Court must grant summary judgment on Count II.[10]

---

[10] The Court is not persuaded by Plaintiff's new constructive discharge argument. Plaintiff raises this argument after the retaliation portion of his brief, but the operative language sounds in an interference claim based on prejudice. In either case, the undisputed evidence does not support a triable issue of constructive discharge. To establish a constructive discharge, "a plaintiff must show 'that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign' and that he actually resigned." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (quoting *Green v. Brennan*, 578 U.S. 547 (2016)). The conditions must go "beyond 'ordinary' discrimination." *Id.* (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004)). Courts

## IV.    CONCLUSION

For the foregoing reasons, it is this 9th day of July 2026, hereby **ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 69) is GRANTED. The Clerk is kindly directed to close the case.

Dated: July 9, 2026                                     _____/s/_____
                                                        J. Mark Coulson
                                                        United States Magistrate Judge

---

must consider whether the workplace was "so intolerable" that she was compelled to resign under an objective standard. *Heiko v. Colombo Savings Bank, F.S.B*, 434 F.3d 249, 262 (4th Cir. 2006). "In assessing intolerability, the frequency of the conditions at issue is important." *Evans*, 936 F.3d at 193. Here, Plaintiff describes job duties in the Northern District that were substantially similar to his duties in PID.  Again, the Court will not consider Counsel's Statement of Facts relying on Counsel's own arguments to hold that there exist genuine issues of material fact. Plaintiff never testifies to an environment that presents the kind of intolerable circumstances such that any reasonable person in his position would feel compelled to resign.